Good morning. We have one case today, which is No. 13-1490, ASTRAZENECA v. HANMI USA. Mr. Alexander. Thank you. May it please the Court. Can you tell us what's happened since we issued the order denying the injunction pending appeal? Has HANMI gone to market? I am not aware of that, Your Honor. I'm not sure that they have. Okay. Your Honor, the District Court's error was in not adopting the ordinary and customary meaning of alkaline salt, about which there was no dispute. Now, all of the intrinsic evidence shows that ASTRAZENECA certainly intended to use the ordinary and customary meaning of that term in the claim. And that's clear, certainly from the clear differentiation in the claims between the independent Claim 1 and the dependent Claim 3 and also the independent Claim 6 and 7 and the dependent Claim 10. Well, we have a kind of an unusual situation here, as I see it, and that is that there's a pretty good argument that the specification was limited to the 6. And it seems to me to some extent what you're saying is we expanded the scope of the claims when you submitted an amendment during prosecution to cover the broad genus. And what are we to do under those circumstances if we were to conclude that the original specification was limited to the 6 and that you tried to expand it with an amendment in prosecution? I mean, I guess that would raise written description and perhaps enablement problems, but does that also have a bearing on claim construction? Well, I think certainly Phillips teaches that you can look to the specification to construe the claims. The Court has not gone so far as to say that you do a full 112 written description enablement analysis in the context of claim construction. I don't know if the Court wants to go that far. In this case, there's two premises that I think are key here. Number one, the claim was not expanded in every respect. It was broadened in the sense that the alkaline salts are claimed now generically. But it was also narrowed in the sense that the claim only is directed to the minus enantiomer. But perhaps more importantly, this is a broadly enabling specification. So what if we disagree with that? What are we supposed to do as a matter of claim construction? Just accept my hypothetical for a moment. That in fact, we conclude that the specification described the invention as limited to the six and that that was the entire scope of the specification. And then during the prosecution, it was expanded. What are we supposed to do as a matter of claim construction under those circumstances? I think the hierarchy under Phillips is you look to the language of the claims first. And you also look to the prosecution. So in your hypothetical, you've certainly got the claim language. You've got the other claims, the clear differentiation of claims. And you've got the clear prosecution history that shows that AstraZeneca claimed alkaline salts broadly. I think in this case, that would trump any concern you might have. That can't be the case because think about it. Suppose that this specification said we are claiming only these six salts, these and only these. And I realize that's not by any means what you argue in this case. So just accept it as a hypothetical. These six salts, these and only these, no other salts. I mean, it is a disclaimer of all disclaimers. Suppose that's the case. Then do you think it would be okay, despite that form of intensely clear disclaimer in effect, to come along through the prosecution process and say, do over. Now I'm going to just put in a claim to alkaline salts. And the examiner, for whatever reason, doesn't hold the patentee to that disclaimer. I mean, it seems the public has a right to rely on it. So do you really think that would be okay? I mean, a true, unmistakable disclaimer in the spec that is not negotiable by anyone. Can you come along in prosecution and claim something broader? Probably not. But that's not what we have in this case. The public notice function starts with the claim language. And here the claim language is alkaline salt. I think the court needs to understand that the invention here is the discovery that you can make an alkaline salt of the enantiomer. That's a very broad discovery. The patent tells you that alkaline salts of the race mate, miprazole, were known. And it was known how to make those. And they were made using a conventional method, which is what's disclosed here in the patent specification itself. Could I come back for just one second to your answer to Judge Moore's question so that I'm clear about it? When you say that you couldn't do that under her hypothetical, that you couldn't expand the claim scope beyond what was in the specification, where the specification was perfectly clear that you were only claiming the sex, do you mean you can't do that as a matter of claim construction, or you can't do that as a matter of written description or enablement? I would say you can't do it as the latter. You can't do it as a matter of written description. So you're saying that the only limitation on doing that is written description and enablement, that as a matter of claim construction, under the hypothetical where the specification is absolutely clear, as a matter of claim construction, you can still come in and say we limited ourselves to six, but now here's a claim where we're claiming a genus of 200 or whatever it is. Yeah, yeah. I mean, if I understand the hypothetical, if the specification says the invention is black, not white, and you come in the prosecution history and you claim white, I think what you have, and if the claim language is clear, you know, I claim white, then you would have, under normal circumstances, a patent that is vulnerable to a validity challenge. Now, time has waived that challenge in this case. Did they waive it only under the district court's claim construction or more generally? No, they waived it for all time as unequivocal, unconditional waiver, and that's reflected in the judgment that's before you. So that option is not open to them anymore. So what you're saying is because they waived the written description enablement, then you can sue them for infringement on the hypothetical for an invalid patent because you get a claim that's broader than you're really entitled to. Well, no, because in this case, in the hypothetical, that could happen in the hypothetical. That's not this case. But if a defendant waives its effective defenses, it leaves itself defenseless. It's not up to us to fix them. That's your argument. But so let me make sure I understand this about whether or not it's a matter of claim construction because that's what I'm really trying to appreciate. So I guess is your view that if you had originally disclaimed anything but the six, very clearly and unmistakably you said, no others but these, and then you came along in prosecution and you made it clear to the examiner that, nope, now we're claiming the entire genus of alkaline salt. No dispute. Everybody understands that you're now claiming the genus. And the examiner lets those claims issue. Your argument is as a matter of claim construction, there isn't any dispute about what the words alkaline salt meant. When we used them, it was clear to the examiner and to the applicant it meant the genus, and to the public by reading the prosecution history, it's clear what those words meant. They would be given their plain meaning. And you may well think that we're limited to these six, but that's something that absolutely is not part of claim construction. It's part of a validity challenge. Is that your argument? I think it's fair to look at the specification to see if there's some support for that. Because Phillips teaches us that we look to the specification. As a matter of claim construction? As a matter of claim construction. I understood the hypothetical to be there's a disclaimer. Because if the patent otherwise supports the claim, even if there's a disclaimer, even if there's a sentence in the patent that says, I claim black, not white. If there's otherwise a description that would support the claim to white, then you could look at that and say, well, fine. Yeah, but I think under the hypothetical we're assuming that there's nothing in the specification that goes beyond the six. They say specifically this invention is limited to the six. And the question is, as a matter of claim construction, when they broaden the scope of the claims by amendment, can they say, well, this may be invalid, too bad. But as a matter of claim construction, we get the broad genus. I think if there's just absolutely no support for the claim to white, it's impossible to get there. Then you've got an invalid patent. But I think as a matter of claim construction. I think you just, again, declined to answer the question. Assume that there is a flat-out, unambiguous disclaimer. Not in the spec, not contradicted by anything else in the spec. And the claim is unambiguously broader than that. In that situation, as a matter of claim construction, the disclaimer governs, right? I don't think so. I think the plain language of the claim would govern in that case. Well, time out. I don't think you mean to answer it that way. Because to answer it that way, the way it was posed by Judge Serrano, would make it seem like disclaimer is irrelevant to claim construction ever under any circumstances. You're saying, as I understand it, when during prosecution, you come back and clearly intend to do something broader, that disclaimer is not meant to be incorporated any longer. And I think the reason I'm having trouble with the hypothetical, is that you've got one, and your hypothetical assumes there's one indicia of intent that I'm not claiming. And then in the prosecution, there's a clear indication of intent that I am claiming. Yes, that is our hypothetical. Okay, so that's kind of a conundrum. And I would suggest... We know you don't think those are these facts. But we need to figure, we're trying to figure out if they are the facts as we interpret them, then what do we do? Okay, and I'd like to be able to explain why it's not the facts. But I think if you have this situation where you've got evidence of disclaimer over here and evidence of a non-disclaimer over here, I think you have to conclude that there's no clear disclaimer. So despite the fact that there might be a statement in the specification, which is one part of the intrinsic evidence that says, I claim black, not white. When you go over here, you have another piece of the intrinsic evidence that says, I'm claiming white. So you've got contradictory, perhaps, indications of intent. Well, that might be relevant if the specifications were ambiguous, but under the hypothetical that we're giving you, there isn't any question about it. The specification says we are only claiming the sex. The invention is limited to the sex. And I would say, in that case, where you've got contradictory indications in the intrinsic evidence, go with the plain language of the claim. What do they claim? They claimed X. And now we can test that. That's now the construction. The construction is the words that the patentee used to write his patent, the claim that the examiner allowed. It might be in doubt under the hypothetical. Can you now tell me why it is you think there is no clear disclaimer here? And in particular, I guess one of the things that is causing me the most concern is the initial application, which contained claims to only the same six salts that are disclosed throughout the specification. Right. You're right. But the original claim was limited to six salts of either the plus or the minus enantiomer. But the discovery here is that you can make an out-of-blend salt of an enantiomer. And there are several pathogens in the specification that tell you that. If you look at column one, for example, at line 43, it says there is no known example in the prior art of any isolator-characterized salt of optically cured ribosol, i.e., of single enantiomers of a ribosol. Not the most clearly worded sentence, but... There's kind of a missing comma right after that. Yeah. What they mean is that... The patent is full of not very clearly worded sentences. Do you realize the abstract has no verb of any kind in the entire abstract? Yeah, I just... Wow. I don't know that English was the first language that the folks who drafted this. But in any event, so... But what it meant by novel optically pure compounds, reference to these six as being novel. No, what's novel are the salts, salts generally. So... But that's the crucial question, right? It may be that nobody had done the salts of the essentially pure enantiomer before. But then the question is, what did you do? Did you suddenly discover that all salts are possible or only... Yes, yes. So where does this ever go beyond identifying the... Essentially the six cations to create 12 salts? So what it tells you is nobody had made a salt of the enantiomer. The enantiomers had been separated before from the racemate. Remember the enantiomers are the right hand and the left hand molecules. But they only existed in liquid form as a syrup. And what the patent tells you... The patent tells you that at column 3, line 35. The same enantiomers had only been isolated and obtained in the syrup form. Further down in column 3, starting at line 47... Column 3? Yeah, column 3. Line 47. The patent says that the salts are stable and resisting racemization, which was surprising. And indeed it was surprising. Because it was thought that if you added a base, such as sodium hydroxide, to the enantiomers... And by the way, that's how you make the salt of the racemic compound, is by adding a base. But if you did that process to the enantiomers, it was thought that they would lose their character as right or left hand molecules and racemize and go back to the original racemic compound. And it was surprising. These inventors were the first to discover that that did not happen. So that is the key to the invention. That you could actually make a salt of the enantiomer using the same process that you used to make a salt of the racemic. So if the court appreciates that, it should appreciate the statement in column 5, which is the only statement, by the way, that mentions the alkaline salts of the invention. A district court statement that it relied on in column 2 doesn't even mention alkalines. It doesn't use the word alkaline salt. It doesn't attempt to define alkaline salt. The only direct statement in this patent about the alkaline salts of the invention is the one in column 5. And it says that the salts are exemplified by the 6. The 6 are just... No, it doesn't say exemplified by 6. And you said this in your brief and it really bothered me because it's a misrepresentation about what this sentence says. Will you please stop nodding, sir? You're really distracting. You've done it throughout his entire argument. Please stop. So it doesn't. It says exemplified by these 4. First it lists magnesium and sodium and then it says exemplified by these 4. So that's the problem. If it said exemplified by these 6, you'd be on so much stronger footing, Mr. Alexander, but it doesn't. Well, I disagree. It says the alkaline salts of the single enantiomers of the invention are, in comma, neopreneal. As mentioned above, besides the sodium and magnesium salt, comma, exemplified by the salts with lithium, potassium, calcium, and ammonium. So the way I read that is that the 6 salts that are mentioned in the specification are exemplary. They're not intended to be limited. It could have said the salts are defined by, are limited to. That might have been a clear disclaimer under this court's law. But they used the word exemplify. These are just examples. And the extrinsic evidence makes clear that the process that's disclosed in this patent will work with any other salt cation. That's what the experts have testified to. And in fact, if you look at A14003 at the footnote, there were several examples of different cations, including zinc, copper, several different forms of ammonia, since this patent that have been made using that process. So the disclosure is broadly enabling. The invention here, the discovery, is that you can make an alkaline salt of an enantiomer using that process without destroying the chirality, without destroying its form as an enantiomer. And that's, I think, key. What's the common sense explanation if one assumes that everybody would have known that the two left columns of the periodic table, all that stuff would work, and any honorary members of those two columns, I think, with your language would work. And then the written description, at the very beginning of the detailed description, comes along and says, the invention refers to, and then they name exactly six, creating 12 with the plus and the minus. Isn't that a striking communication to a world of readers that would think, if you could do this with some, you could do it with all, that no, no, we actually think it's important which ones you use. So what's the explanation for that language if it's not that? It's awkwardly written. If that were the only... But the identification of the six is not awkward. No. It's really quite striking. It says, OK, we're going to stop at this level of the periodic table and ignore everything below. Right. But I think that's contrary to the passage in column 5 that says they're exemplary. Well, suppose we don't agree with you about column 5. Right. It's pretty clear that isn't it? What's that? No. No? No, because there are other statements about the invention, the present invention, that emphasize other characteristics that are plain. There's the passage that talks about that, you know, we're talking about compounds of high optical purity and crystalline. It's your argument. Could I possibly phrase your argument this way? And it's a little different than how you phrased it, but I'm wondering if you're nonetheless thinking it is a fair characterization, which is to the average person it might look like you're claiming at column 2, lines 43 to 46, these six salts, but to one of skill in the art it wouldn't look like you were limiting yourself to those six, because these are the six standard off-the-shelf salts that every chemist has in his lab that are easy to go to and use. And the one that they use for infringement purposes is an identical substitute for magnesium, and everyone knows that it's just more expensive, so it isn't the one that you would have grabbed off the shelf. And so it's your, I guess, now, but see, all this unfortunately isn't really in the record, right? I'm kind of telling you something that I wish there were an expert report that said it, but there isn't, but nonetheless, it's your argument that one of skill in the art knows that these are the six standard salts, and that's the reason they were selected, because they're the common, cheapest, easiest ones to use. There are certainly common salts used in pharmaceutical formulations, and if you do look in the record,  You'll see there are a number of other patents and publications. You didn't actually answer my question, so I guess, are you willing to adopt, or is part of your argument that, Judge Moore, to you, that may look like a disclaimer, but to one of skill in the art, it would not? Yeah, absolutely, I agree with you completely. How many compounds are there beyond the six within the scope of the claim the way you view it? We don't know. You don't know? We don't know. Hundreds? Dozens? Thousands? It's not clear, but what is clear is that it would be predictable to form a salt with any of those other compounds. Once the concept was demonstrated... Well, it might be predictable to form a salt, but it wouldn't be predictable to make one that was therapeutic, would it? Correct. Well, no, not correct, because if the salt is with the negative enantiomer, then all of the evidence in the record shows you that that will work. Well, some of them are toxic, right? Well, sure, yes. Some of them might be toxic, and those are not included with the claim. Some of them might not work. No, the evidence is that they would work. What evidence? I mean, the only evidence was a study limited to two of them, two of the six that were claimed. But the study showed that it's the minus enantiomer. The active ingredient in this drug is the minus enantiomer. The salt is like a carrier. It's not therapeutically... It doesn't have any therapeutic impact in the compound. Now, some salts are more stable than others. Some salts are more soluble than others. Some are more hydroscopic, which means that they might have a better or worse shelf life than others. Okay, that's what the salt affects. The salt affects some of the physical characteristics. Salt does not impact the active ingredient, which is the minus enantiomer. You're saying any salt, basically any base, is going to come in and... Yes, it should, because... ...take time, and it's all going to work. Now, some of it might not be therapeutically acceptable because it could be toxic, but one of the skill in the art was... And that's through routine testing. You would know that through routine testing. You're right, so some of these salts, you would never want to make a drug out of. I mean, you know, there's no dispute. But all of them would do the work of bringing in the base and thereby isolating it. Right, because the proof of concept in this patent is that you could make the salt in the first place. Once you know that you can make the salt in the first place, then you can look around for salts that you might like, and some might give you better characteristics than others. And you can find all that out by routine testing, so it doesn't matter how many possible salts there are. Okay, someone of skill in this art can figure out which ones are going to work for them and which ones aren't. No, I feel like I just worked on a case not long ago where I said at some point the hunting license can be too much and that that could result in non-enablement. I don't remember what case it is. Okay, but that's not in this record. HANMI doesn't have that. But what you said also is not in this record, right? No, no. If you look, there's expert testimony that's in the record. You're talking about Mr. Anderson's declaration? No, I'm talking about Dr. Davies' declarations that were submitted in connection with the plane construction briefing. So Dr. Davies, if you look at A8640 to A8641, he explains how the specification says you make the salts. If you look at A8646, he explains A8647, he explains that this method is broadly applicable and it's applicable to other salts, and he takes on the one argument that HANMI's expert made, which they didn't put in this record. I don't know why that wasn't so. If you look at... Let me know if I'm going too fast for you. If you look at A13999... Can I just... Sure. Where... I guess I'm trying to understand, to try to make this a little bit more precise, about what the state of the evidence is. First, what Dr. Davies said. Second, what's contradicted about whether either the method of making or the identification of suitability of being a pharmaceutical formulation, which goes beyond the act of ingredient. It might dissolve on the shelf. It might whatever. Is that everything covered by your broad interpretation of the claim would be within the range of the predictable? For example, when you say... You cite to paragraph 41 of Davies at 8647, it says the methods of preparing are applicable to other basic salts. Well, that could be true and yet not cover the full range. It could also not cover the requirement of suitability that you need to import into the phrase pharmaceutical formulation. I guess I want to understand what the record is. Sure. There's a distinction between salt formation and salt selection. Salt formation is very predictable. We all know that things in the first column of the periodic table form salts the same way as each other, column two, etc. Okay. And that's what Davies says is very predictable. And that's what's being claimed. The claim is to a pure... Did he ever say that it's predictable which salts would turn out to be suitable in the meaning that you give to the phrase pharmaceutical formulation? He acknowledges that you have to do some experiments to see which were suitable. Right, that's in the deposition. Does he ever actually say that the results of those experiments are predictable? Yeah, he... I'm not sure why he would do the experiment. Yeah, I mean, what he says is that you have to do some experiments. Nobody says those experiments are undue. These are the roots... Right, but now we're shifting a little bit from enablement questions and I want to really focus on predictability as it's used in written description, not enablement, as perhaps relevant to the land instruction. Yeah, you can... You cannot predict all of the physicochemical properties of a given salt before you test it. Including things like stability. Including things like stability, solubility, hydroscopicity, other things, whether it absorbs water. So you can't predict which ones of the non-toxic genus would actually work as a pharmaceutical composition? Well, they... No, that's a different question. No? You can predict that. Because if the salt is of the minus enantiomer... No, no, but it wouldn't work as a pharmaceutical composition if it dissolved promptly on the shelf, right? Yeah, well, sure it would. I mean, it depends on how... It just goes to shelf life, right? It goes to shelf life, it goes to... Right, right. Some are going to be better than others and I can't predict which ones are going to be better than others. Which is the one that you want to actually spend the money to take all the way through the FDA trial process? So you're going to have to do some experiments on the front end to figure that out. You could choose the most commercially viable. Correct, correct. Well, what about somewhere between commercially viable and would have a desirable effect within the first five minutes after you took it out of the test tube is your notion of pharmaceutical formulation, right? Yeah, a pharmaceutical... The question is what works for the... What you say is part of the claim, right? Right, right. The claim, if it's a salt of the minus enantiomer, the record says it's going to work. It's going to be a pharmaceutical formulation with everything that you build into that including avoiding toxicity and I think you build other things into that. Well... And that's what I thought you said a moment ago actually requires experimentation that might not be undue but nevertheless is not predictable. Right, and maybe we're... I'm not quite understanding your question. It's going to work as a pharmaceutical... It's going to have a pharmaceutical clinical effect. Are you saying that pharmaceutically effective has nothing to do with any property except non-toxicity? In this case, yes because the claim is to pure solid-state alkaline salt of the minus enantiomer. Okay, that's all that's required by the claim. And we know if it's a salt of the minus enantiomer it's going to be effective. Okay, you might have a salt that's toxic but then that's not going to be a pharmaceutical formulation. Well, if it's unstable, it's not effective, right? If it can't last for more than two minutes it's not effective as a pharmaceutical composition, no? Well, but you can do a routine experiment to weed those out. But the results are unpredictable. No. No? No. Who says that? No. Yeah, you're going to have to do some testing. Well, is there any evidence that the results are in fact unpredictable regarding stability in this record? No. I thought their experts said expressly it was unpredictable. That's why I was asking if you can parse the Davies' testimony. Yeah, if you look at Atwood, he says... Your testimony, what page are you on? 13, 963. Okay. If you look at paragraph 110, he's talking about the salt selection process being unpredictable. And he's talking about the different physicochemical properties. But look at 111. Along with the unpredictability of salt formation, the physical and chemical properties of any salt form are impossible to predict. So he says that it's actually not just about the formation, but about the... Right. But he never gives a reason for why he thinks salt formation is unpredictable. All of his reasoning here goes to salt selection, saying that I don't know whether one's going to be more soluble than the other. Well, to some extent what we've been talking about depends on how we construe pharmaceutical. You want it to be narrowly construed now, so it only means non-toxic, whereas there's an alternative construction that says, well, it has to have certain properties that make it suitable for a pharmaceutical composition that go beyond non-toxicity. Right. Yeah. We don't need the suitable for use in a pharmaceutical formulation gloss, but that was a gloss presented to the district court. Alkaline salt is... A gloss given to the district court by whom? I asked her originally to propose that. Proposed that? Right. So your own claim construction would have included these other properties? No. That was just intended to be consistent with the claim preamble, which is that you have a pharmaceutical formulation. There's no limitations on how good of a pharmaceutical formulation you have to have in this claim. I think you're talking about reading in some kind of limitations on what a pharmaceutical formulation has to have beyond being non-toxic, but there's no reason to do that here. Before we finish, I want to come back to the earlier hypothetical. And, of course, if there was a lack of written description here for the broader genus, the examiner would have had an obligation to reject the claims on that basis. And when I look at the remarks that the applicant made to the examiner, I see reassurance not to have to worry about that. There's a statement that the claims are fully supported by the specification. There's a statement that we're not introducing any new matter. Is it fair to read those as reassuring the examiner that there's not a written description problem and that the claims that are now being asserted are not going beyond what's supported by the specification? Yes, it is reassurance. But I'm sure, again, what AstraZeneca had in mind and what they knew is that this is a broad disclosure, the first disclosure that you can make an alkaline salt of an enantiomer. They didn't intend to limit the claims to the six salts. Well, why wouldn't, if we were to accept the hypothetical that the specification was clear as being limited to the six, why wouldn't these statements to the examiner be essentially saying, okay, we're not going beyond the six? It says the claims are directed to alkaline salts. I don't think you're answering my question. The genus of alkaline salts. Yeah, the genus of alkaline salts. And then you can't, under that rubric, you can't explain why... But if the original, under the hypothetical, if the original specification said only six, and you go to the examiner and you say, don't worry, these amendments don't introduce new matter, they're fully supported by the specification, why wouldn't one read those reassurances that the examiner is limiting the claims to the six? Because it doesn't make any sense. You can't square that with the introduction of the dependent claim that says the alkaline salts in claim one are now only limited to the six. You can't reconcile it with the words of the statements themselves that these claims are directed to alkaline salts and the full scope of the genus of alkaline salts. I think they were very clearly telling the examiner, we're claiming the genus alkaline salts, and, in fact, the specification does support that. All right, anything more? Okay, thank you, Mr. Alexander. We'll give you two minutes for rebuttal. And, Mr. Jacobs, if you need additional time, we'll give it to you, too. Thank you. Thank you, Your Honor. May it please the Court. Let me begin by addressing the first question that you, Judge Dyke, brought to AstraZeneca, and that was the impact of the potential indefiniteness problems or validity questions with regard to claim construction. It strikes me that the Court's recent opinion in their crop science versus Dow AgriScience strikes the appropriate balance there. Essentially, in that case, the panel said that, although Phillips says that the validity analysis is not a regular component, in other words, a necessary component of claim construction, there is still room for reliance on invalidity considerations as part of the claim construction process for the words that the panel used there were bolstering considerations. In other words, as part of looking to ensure that the intrinsic... What do you do about the consent judgment? I mean, your friend on the other side said, in an unconditional way, you have waived all validity challenges. It is correct that for future proceedings, we have waived validity challenges and a number of, as you can expect, considerations were obtained, but that does not... Well, whatever the claim construction. It was not part of a claim construction proposal. It was a pure validity, speculative validity only. Nothing at all was addressed with regard to whether the validity issues would be re-raised at any point in time. As a matter of fact, the consent judgment contemplated that there would be an appeal, of course, and obviously, claim construction was the only issue at that point in time that the parties anticipated moving forward. I think as you spoke more, I got confused about your position. Does the waiver of validity challenges bind you even if we reverse the claim construction? If you reverse the claim construction, the waiver of validity is a waiver of validity. Consent judgment, we will not be challenging the validity in the future. My point was that that is not a waiver of raising the validity question with regard to altering considerations, just looking at are we talking about a scenario here if we look at the intrinsic record where, in fact, a proposed construction being requested by AstraZeneca goes beyond the scope of written description and beyond the scope of enablement. Can I ask you a question that I think you adverted to, but AstraZeneca didn't seem to make very much, if anything, of this. In your own patent, the 219 patent, when you refer to the 504 and I guess the 818, is that apparent? You describe it as disclosing S omeprazole salts and hydrates thereof, EG, lithium, sodium, potassium, magnesium, calcium, and ammonium. Doesn't the EG there imply that those patents are not limited to those 12 salts? The court has actually gone both ways with regard to the use of EG. In one example, the court, looking at the totality of the disclosure, has found that EG actually does indicate that that is what they are looking at, similar to IE, for example. But the specification here, with regard to the 504 patent, is much more explicit than using the terms EG. It uses the words, as Your Honor pointed out, refers to, for example. It uses on three different occasions the word novelty when it's described starting in the abstract, novel, optical, pure compounds, and then it lists the six salts. Isn't the novelty arguably there, the optical purity? I mean, that's what is really nifty about this patent, right? 98 to 99% pure when you couldn't get more than 95% in the prior bars. I think that is part of it, and the summary of the invention, column one, tells us that. And it tells us at the end of the first paragraph in the summary of the invention, after talking about the compounds with the improved pharmacokinetic and metabolic properties that you're talking about, Your Honor, it says, the present invention provides such compounds, so compounds, they're the optically pure compounds, which are novel salts of the single enantiomers of imeprasol. So, which are novel salts of the single enantiomers of imeprasol? If you look at column two, the detailed description, notice that right after the new, in what we're talking about, right under the detailed description, the new, that lists the six salts, and then it says, salts of the single enantiomer of imeprasol. So, it's telling us that those novel optically pure compounds are, in fact, single salts of enantiomer, and they are the six salts that are disclosed. And there's actually a very, very good reason for that. They were looking specifically for salts that were resistant to racemization here. And, in fact, under typical alkaline conditions, salts would not resist racemization. This is explained in detail in column three, starting at line 43 through 55. And there's one very, very important statement. Okay, hold on, because I want to make sure I understand this technology, because this is not my area of expertise by any means. So, you're suggesting that to a person of skill in the art, there's reason to believe that these six salts would be resistant to racemization. Did I even say that right? Yes, you did. Okay. So, but that other salts that people of skill in the art know are normal substitutes for these six would raise question marks about whether they would be resistant to racemization. And that's, Your Honor, why testing, for example— Wait, but is there evidence in the record of that? Is there evidence in the record that there was a reason to believe these six salts are good at preventing racemization, but that others would not arguably be? There's evidence in the record for at least two, sodium and magnesium. And let me direct you to that. If you look at lines— It's the contrast that I think the question— There's clearly evidence that for those two, if they did the experiment, it will. The question is, what evidence is there that not all salts will be the same? Okay. That is addressed in the specification, and it says, moreover—this is in line 48 in column three— moreover, the optically pure salts are stable, resisting racemization, both in neutral pH and basic pH. They're describing the tested salts, now, magnesium and sodium. And it says, which is surprising, since the known deprotonation of the carbon atom between the pyridine ring and the chiral sulfate atom was expected to cause racemization. Under alkaline conditions, but it didn't. And it doesn't—there's no—I guess I don't understand from that sentence how you're extrapolating to other salts would create problems, because they're all alkaline solutions. Well, they're indicating here that the particular benefits of the tested salts provide that. And then it says in the next sentence, this high stability against racemization makes it possible to use a single enantiomeric salt of the invention in therapy. So the only thing that is disclosed, the only thing that is discussed, if you look at column 13 of the patent, they actually talk about the racemization and the stability issues starting at line 31, is in fact the surprisingly high stereochemical stability in the alkaline conditions for the compounds of the invention. And in all of that discussion, what they're talking about is the testing that was performed on the sodium and the magnesium salts. Now, if the question is, is there an express statement somewhere in the patent that other salts for some particular reason— Can you just walk me through column 13? You went a little fast for me, and I just can't follow where you were reading from. Yes, Your Honor. The stability of the optically pure compounds of the invention against racemization has been measured at low concentrations. Is this what you're reading from? Yes, Your Honor. And so starting at line about 31 there, when it talks about the stability of the optically pure compounds, it's talking about their—it says has been measured. The measurements come from the tests that are described above, and the tests are only performed on the sodium and the magnesium salts. And then I was pointing you to— Well, wait a minute. But then if that were true, then that would almost contraindicate that any of the other four that they give as examples would have the same stability. I can't read the sentence the way you want me to, or it reads out four of the things that you admit are included in the claims under any set of circumstances. Well, it appears, and it isn't expressly stated, that the inventors knew that the four additional salts— lithium, potassium, calcium, and the final one— could also be used and would provide similar benefits, and that's why they described specifically in column 5 those additional salts. Why did they choose magnesium and sodium as the two to focus on, both in the spec and in the declaration in terms of actual testing? They are, especially sodium, the benchmark for this type of stability. Well, then why magnesium? Just pull one out of the hat? No, magnesium also is very, very appropriate for providing the stability, probably not at the same level of sodium. If you look at the spec, sodium is the most preferred. Didn't they choose them because it's a monovalent and a divalent? They chose the two opposite extremes, and they chose them so that they can say, look, if these two extremes work, everything in the middle is going to work, too. Isn't that exactly why the examiner accepted their argument that by demonstrating these two work, the whole genus is supported? Because the examiner said, you can only cover what you can give me data to show will work. So, of course, that left me thinking, well, why the heck didn't you limit them to just those two, since they only gave those two? So I had to do a little bit of learning to figure out why magnesium and sodium might have been chosen. And what I discovered was monovalent and divalent, if there's any likelihood of instability or unsuccessful working, that that's where you would likely see it occur, and that all the others are much more closely related and likely to behave more predictably. So that's why I think they did, but tell me if I'm wrong. I mean, the examiner seemed to accept, you tested these two, I'm going to give you the full genus now. So why would he have concluded that otherwise? Well, it seems, Your Honor, that, don't disagree with what I'm saying, but it seems that what the examiner did was, the examiner said the scope of the claim will depend on the data submitted. Now, you could argue, as we have argued here, that in fact the scope of the data submitted is two of the six salts, but it doesn't go beyond the six disclosed salts. There is some ambiguity in there, and that's why the intrinsic record is so important here. Well, but the intrinsic record, if we're talking about there's ambiguity in the Anderson Declaration, and whether or not the disclosure and testing of those two salts can support alkaline salts generally, didn't the applicant make it quite clear to the examiner, I mean, the remarks, which begin on 3232, and in particular on 3233, this is not a particularly long document, it's nine pages in length in total, but in the characterization regarding the Anderson Declaration, it is explained that we tested monovalent sodium salts and divalent magnesium salts of the negative enantiomer of amyloprasol, thus supporting the full scope of the genus of alkaline salts. Just disclosed in the application and explained herein. Yes, but you and I both know, and I don't know a darn thing about chemistry, but I know this much, that no chemist in their right mind would refer to a species as a genus. That to me is elementary, and I fully admit I don't know much. So by virtue of saying the genus of alkaline salts, is there really anybody, if you say I'm claiming the genus of alkaline salts, is there really anybody in the world that's going to understand you to be talking about only a couple of species within that genus? Well, you can define genus as six specific species, which is what happens here, and one way... As in a marquish. Exactly, as in a marquish plant. And sometimes we've actually, surprising to me, used the term genus to describe marquish plants, which are just the listed ones. But what happens here, Your Honor, was the intent with regard to the scope of the claim is clear when you look at the original application, which lists the six specific salts. Then during prosecution, substituting the word alkaline salts cannot expand the scope of those six specific salts because at the same time, they're telling the examiner the subject matter of the new claim is fully supported by the specification and... But what do you do with it? The claim differentiation aspect of this is the part that seems to me to scream out, if you want to know what they intended when they wrote the new claims, they intended something wrong. Now, maybe you have an argument that in their intent, the world's understanding of the new claim language isn't a governing standard. But can there be any serious doubt that when they went in and responded to the rejection, at first they limited everything to the S enantiomer, and then they said, we want something broader. And even if one could argue about the exact prosecution history language, the claim differentiation just says it's more than these six. Well, claim differentiation, as Your Honor knows, is only applicable if, in fact, there is not a definition that is provided in the specification. But I think that Judge Toronto is getting the point of we're trying to ascertain what the examiner believed he was allowing, right? Because that lends some insight onto at least what the applicant intended to seek and what the examiner believed he was allowing when he issued the words alkaline salts. So I'm with you. I think claim differentiation by and large is a very weak doctrine that has limited applicability. However, for purposes of simply looking at did the examiner think when the applicant said the genus of alkaline salts, they were referring to only these six, versus what the claim language would mean, the genus of alkaline salts, the examiner, isn't his view of it also informed by the claim differentiation argument? Doesn't that also at least, whether they're entitled to it is a different question, but doesn't that at least indicate that both the applicant and the examiner at that time believed they were claiming something broader in Claim 1? I would not deny that it certainly provides some speculative look into what the examiner was thinking. However, if you think about the statements that the court put forth in Honeywell and Edward Life Sciences where the court said even if we have complete redundancy created by limiting to the specification based on the present invention type statements, that is something that is an unfortunate occurrence. And so we start not with what the examiner was thinking. What the examiner was thinking is a confirmatory of the intrinsic record. We start instead with the intrinsic record. And as we walk through the intrinsic and contrived record here, every time we see the word the present invention or according to the invention, they're referring to either all six of the specifically enumerated salts or the two salts that were tested, magnesium and sodium. There is absolutely no mention of any other type of salt. There's no notice that's provided to anybody that anything other than these six salts are what is necessary to provide the benefits of this invention. And as a matter of fact, there's probably a reason for that in that the original claims claim exactly. Yeah, I can't figure out why they did that. That makes no sense. And they can't now come forward and broaden that because to broaden that they would need the support to do so. And I think that honestly they were just putting forth a synonym essentially in their minds for those six salts. It seems quite clear to me that they were not believing they were putting forth a synonym at that time and nor did the examiner based on the prosecution history. Now whether we ought to limit their claim to that based on disclaimer is a different question. But it seems to me to be an unfair characterization to suggest in their prosecution history that it was their intent to limit themselves. Fair enough, but you can look and see that essentially there was a substitution of the six specific salts for alkaline salts. And other than that the claim weren't changed substantially. But in conjunction with the substitution they said now we are disclosing and supporting the full scope of the genus of alkaline salts. And the plain meaning of those words includes a lot more than six. I respectfully disagree. The full scope of the genus as described there is what they've described in their invention. The six specific salts that are listed here for providing this increased stability that is described here. They had the opportunity when they provided the rate description to list and describe any other type of salts. This is not a fair notice situation where they've just chosen six and there are many others that would apply. That would actually be a very, very confusing way to provide notice to the public. Can I ask you I guess the same question Judge Dyke asked of Mr. Anderson. Have you entered the market with your product? Fair question. We anticipate entering the market in December. Some testing needs to be done. We anticipate mid to late December to early January. And this patent expires when? February 3rd. Yes, February 3rd. If you don't go to market before February 3rd does this case become moot? Seemingly it would. Okay. Any other questions? Thank you. Thank you very much. Mr. Alexander, you've got two minutes. Yes. Just to clarify, the expiration date of the patent. Just on that last question.  before February 3rd, they're going to be moot? No. The patent expires February 3rd, 2015. Oh, another year? Yes. So this patent lives on. I think that it's crystal clear from the record what AstraZeneca intended to claim. And I think the only way to limit that is if there truly is a clear disclaimer in the specification. And there isn't. At best, perhaps there's some ambiguities, but there is the statement that says that the alkaline salts that the President mentioned are, in addition to magnesium and sodium, exemplified by the four other species. That is not a clear, concrete definition or limitation. That is just a list of exemplary candidates. And you can understand why it's just a list when you understand the broad nature of this discovery and the broadly enabling nature of this methodology. So I think those are key points here. And under this court's law, I don't see any case that would require any limitation to something that is clearly narrower than the language of the claim. And the claim differentiation point, I think, is perhaps even the most powerful because there's no rational explanation for why the dependent claims exist other than to show that AstraZeneca claimed more broadly the alkaline salts of the myosinian tumor in the independent claim and then separately set forth the six examples in the dependent claim. Okay. Thank you, Mr. Alexander. Thank both counsels. Case is submitted. All rise.